THE CHICAGO, KANSAS & WESTERN RAILROAD COMPANY
v. JOHN D. O'CONNELL.

PERSONAL INJURIES — *Exemplary Damages — Erroneous Instruction.* In an action to recover damages for personal injuries, where there is no testimony showing that the negligence complained of is so gross as to amount to wantonness, and no willful or malicious acts are proven, it is error for the trial court to instruct the jury that "they are at liberty to award what are termed exemplary or punitive damages; that is, damages which are given, not on account of any special merit in plaintiff's case justifying the same, but as a warning and lesson to the defendant, to teach it greater respect and care for the rights and safety of others." The case of *K. C. Ft. S. & G. Rld. Co. v. Kier,* 41 Kas. 671, cited and followed.

*Error from Chase District Court.*

THE facts are stated in the opinion.

*Geo. R. Peck, A. A. Hurd,* and *C. N. Sterry,* for plaintiff in error.

*Madden Bros.,* for defendant in error.

Opinion by SIMPSON, C.: The defendant in error brought an action in the district court of Chase county, against the plaintiff in error, to recover a judgment for a personal injury to himself, resulting, as he claimed, through the negligence of plaintiff in error. A trial was had by a jury, and a verdict of $700 returned in favor of defendant in error for that amount, and costs. This proceeding is to reverse that judgment. That portion of plaintiff's petition which sets out the negligence claimed, and concerning which evidence was offered at the trial, reads as follows:

"That on or about the 13th day of March, 1888, the said defendant was engaged in the digging and constructing of a tank well for its business, near its line of road, and also near to its round-house between Strong City and Cottonwood Falls, in Chase county, Kansas; that the said plaintiff was in the employ of the said defendant railroad company as a laborer, among others at said time, digging in said well, and filling dirt in boxes to be elevated out of said well; that said defendant had the furnishing, and it was its duty to furnish all the appliances, machinery, structures and conveniences in and about the digging, construction and operation of said well; that over the top of said well there was erected a scaffolding attached to piles driven in the ground; that between the four cross-timbers or beams that constituted the frame of said scaffolding there was a square opening through which the boxes for elevating dirt out of said well ascended and descended; that on the top of the frame of said scaffolding there were two upright shafts or pieces of timber secured at the bottom of said frame, and immediately over the top of said well; that on the top of said pieces there was a cross-piece of timber, to which, about midway, was attached a pulley, through which said pulley and another one attached to one of the upright shafts or pieces of timber above mentioned the rope that elevated and lowered said dirt boxes passed into a windlass that was operated by a steam engine that was stationed near said well for that purpose, and that said engine was operated by an engineer by the name of Scott Sharper; that as fast as the dirt was taken out of said well by the operation of said appliances, it was deposited in a dirt car, that was run immediately over the top of the well to re-

ceive said dirt, and said dirt was conveyed away from said well in said dirt car, and upon a track built for that purpose, and upon which said car ran; that it was necessary, for the reasonable safety and proper security of the plaintiff herein, who was working in said well, that said square opening immediately over the top of said well be kept free and unimpeded, so that the rope should be, to the extent thereof, free and untrammeled in its operation; that said defendant, by its agents and servants acting under power and authority from the defendant, did, in the doing of said things, carelessly and negligently, and without reasonable care and prudence in the premises, place three heavy planks or boards, loosely and insecurely fastened, and unsuitable and unfitted, and improperly prepared for that purpose, upon the top of said well, upon the cross-beams aforesaid, thereby narrowing said square opening so that the rope could easily come in contact with said heavy planks or boards; that after having been so placed over the top of said well, they were by said defendant, its agents and servants aforesaid, carelessly, negligently altered and changed, and the inside plank was changed by cutting the same with an ax, so that a narrow and insufficient portion thereof only extended onto the frame on either end, and thereby rendering it less secure and more dangerous, hazardous, and perilous; and said defendant, by its agents and servants aforesaid, did negligently and carelessly suffer the said planks or boards to remain unsecured and out of repair, and each and all of said boards or planks so carelessly and negligently placed and altered as aforesaid, and suffered to remain as aforesaid, were each and all extra hazardous and dangerous to the life and limb of persons working in said well, all of which was well known, at all times, to said defendant and its agents and servants aforesaid; that while the plaintiff herein was engaged in working in said well, and while a box was being elevated out of said well by means of the appliances aforesaid, said rope came in contact with said planks or boards situated and placed as aforesaid, and, without any warning or signal to plaintiff by said defendant or any of its servants or agents, and by the force or violence of the contact pulled one of said heavy planks or boards from its place down into the well and upon said plaintiff, which plank crushed, wounded and maimed the hand of said plaintiff, breaking and dislocating the bones thereof; that the placing of the planks or boards hereinbefore mentioned, and the alteration of the same so as

render them less secure and more dangerous, and the allowing of the same to remain in the condition they were in at the time of the injury to plaintiff, were unknown to the plaintiff, but was known by the said defendant, its agents and servants as aforesaid; and said defendant, its agents and servants as aforesaid, knew that the position of the plaintiff in said well was extra-dangerous and hazardous to his life and limbs, by reason of said rope coming in contact with said plank, or either of them, and throwing the same upon said plaintiff in said well, and the same could have been known by the said defendant, its agents and servants as aforesaid, by the exercise of reasonable and ordinary care in the premises; that the plaintiff's work in digging in said well and filling the boxes with dirt as aforesaid was an extra-hazardous and dangerous position, and required great diligence and care on the part of said defendant to guard against injury; that the placing of said planks as aforesaid and the altering of the same as aforesaid, and the allowing the same to be out of repair as aforesaid, and the carelessness and negligence of defendant's engineer as aforesaid, and his incompetency, caused and produced plaintiff's injuries as aforesaid."

To this petition the defendant below filed an answer containing a general denial, and the defense of contributory negligence; and upon the issues so made up the case was tried. The defendant prepared certain special findings of fact in said cause to submit to the jury for them to answer; that among the others, the following occurred:

"How much, if anything, do you allow plaintiff as exemplary or punitive damages?

"How much do you allow plaintiff for compensatory damages?

"What amount, if any, do you allow plaintiff for medical and surgical care—medical attendance?

"And thereupon, when said defendant was about to submit said questions and the court had approved of their submission, the attorneys for plaintiff and defendant agreed in open court to submit said cause to the jury without argument, upon consideration that said special questions should be withdrawn, which condition was made by plaintiff's attorney; which agreement was made in open court, and carried into effect by defendant's withdrawing said questions, and thereupon said cause was submitted without argument to the jury.

"Thereupon the jury retired to consider of their verdict, and that afterward, and on the 23d day of June, 1888, the jury returned into court their verdict, which is in words and figures following, to wit:

" We, the jury impaneled and sworn in the above-entitled case, do upon our oaths find for the plaintiff, and assess the amount of his damages at $700."

The material facts are that prior to the 13th day of March, 1888, the plaintiff in error dug a large well at its round-house between Strong City and Cottonwood Falls; and it also started a second one.   This second well had been started in this way: A test-well six feet square, and curbed with boards, had been sunk to a depth of 30 feet—that is, a well 30 feet in diameter, having this test-well in its center, was started by digging down to a depth of from 8 to 10 feet, leaving this test-well in the center.   When the large well was sunk to a depth of from 8 to 10 feet, curbing was put around the inside, and then four piles, each 40 feet in length, were driven down so that they formed a square that was 12 feet each way—that is, from each pile to the other there was a distance of 12 feet, measured in any direction, and in the center of this square was the test-well.   The tops of these piles, when sunk as far as they were to be sunk, were a little above the level of the ground; and, upon the tops being leveled and squared, a crib or framework of timbers was placed thereon, 12 feet square, except that the two timbers running east and west on each side extended to the ground.   This crib was built up by timbers crossing each way on top of the first heavy timbers to a distance in height of some three or four feet; on the top of this crib were placed two upright timbers about 12 feet high, braced on each side to keep them upright, and another timber was placed upon the top of these two upright timbers, making a cross-beam, in the center of which was fastened a pulley.   This pulley was directly over the center of the large well.   A track was laid from the railroad track on the outside, and of the same gauge as it, north, and upon this crib, so that the same ran from the south to north of the center of the well a few feet.

An engine located some 80 feet to the west of the well contained a drum for the purpose of winding up a rope running from it to a pulley at the foot of one of the upright posts, and from such pulley to the pulley over the center of the well, on the beam across these upright posts, from whence it hung down with an iron hook over the exact center of the large well. There were three dirt boxes, three feet square and three feet deep, which were made with movable bottoms, and chains running from the corners to a common center, into which the hook of this rope was fastened. The scheme was this: To lower these three dirt boxes, and as fast as one would be filled the hook at the end of the rope running over the pulley on the derrick would be fastened to the chains attached to the box, and upon a signal from the men who attended to loading the box and fastening the hook to it, the engine in the engine house would cause the drum to revolve, winding the rope up upon it, and thus causing it to hoist the box to the top of the opening on top of this crib, and up high enough to run a dirt wagon or buggy on this railroad track under it, when the bottom of the box would be unfastened and the dirt would drop out of it into the wagon, which would then be run down the track, on the crib, off and upon the railroad track. The opening through which the dirt boxes were hoisted was 4 feet 8 inches wide, and considerably longer north and south, making a hole probably 4 feet 8 inches east and west, and from 5 to 6 feet north and south. The top of this crib, outside of the hole, was planked over. On the north end of this railway track, which came from the railroad up onto this crib, were three planks about 1 foot wide, 2 inches thick, and from 6 to 7 feet long. These three planks were nailed across the top of the scantling that held the track for two purposes: one to stop the dirt wagon or buggy from going any further north, when it was run up empty to receive the dirt from the dirt boxes, and the other to prevent the dirt falling out of this dirt wagon from falling back into the well, this dirt wagon being open on the north end.

The day before the injury occurred, upon completion of the crib and track, the rubbish and stuff of that kind had been hauled up out of the well in these dirt boxes, and on the morning of the injury they had commenced to raise the dirt out of the well in the manner described, and had, prior to the time of the injury, hoisted up from three to five boxes. The foreman in charge of the work, believing that these planks spoken about, on the north end of the railroad track, prevented the dirt wagon or buggy from running far enough to the north, took an ax and either chopped out a piece on each track in the first plank, so that the dirt wagon could go further to the north, or else split off a part of the first or south plank to accomplish the same purpose. These planks were fastened to the scantling on which the track was laid, by from five to seven spikes in each end. It was claimed by the plaintiff below that the foreman split off so much of the first or south plank as to leave the remainder held by one spike in each end. Immediately prior to the accident, and after this plank had been cut, the plaintiff below and two other employés had taken an empty dirt box and placed it on the northwest side of the well, outside of the square made by the pilings, within about two feet from the outside embankment, and had there filled it. This box, when it was carried to the place where it was filled, was carried by plaintiff and his comrades, and had the rope hitched to it. When it was placed, the rope ran, from its connection with the box, on a slant, so that it bound on this plank that had been cut. This dirt box, when filled, weighed about 1,200 pounds. When this dirt box was filled the plaintiff gave the signal to hoist away, and took hold of the box to steady it. As the engine started and the rope straightened out, it threw this plank that had been chopped into up into the air, so that it fell on the north side of the crib, into the well, striking the plaintiff on his hand, breaking two or three of the bones; and this was the injury complained of.

On the part of the plaintiff below, it was claimed that it was negligence for the foreman to chop into this plank so as

to leave it fastened with any less spikes than it originally had to hold it in its position; and that such negligence was the direct cause of plaintiff's injury. On the other hand, the defendant claimed that plaintiff's injury was solely and entirely caused by his own negligence, or the negligence of his coëmployés combined, in this: that it was never intended, in putting these planks down, that the rope which hoisted the bucket should ever bind upon or come in contact with these planks in hoisting the bucket; and the men were particularly warned and cautioned not to set the bucket so far to one side as to have the rope bind upon any of the timbers. If the rope hung straight down, it is an undisputed fact that it would be from three to three and one-half feet from it to this plank. If the dirt boxes were set anywhere inside of the square made by the piling, between the piling and the curbing of the test-well, the rope, when hitched to the dirt box, would not bind or rub upon this plank or any of the timbers. It was not expected or understood that the rope would catch on to these planks, and they were not put there for any purpose of that kind. Plaintiff's injury was such that, under ordinary circumstances, he would be expected to recover from such injury in the course of about three months. There was some conflict in the evidence as to the warning of the foreman to the men not to set the bucket so far at the side as to make the rope bind upon the timbers, but the preponderance on that question was with the plaintiff in error. There was no evidence as to the value of the attendance of a physician, or as to his charges, or as to the liability of the defendant in error for his services. Prior to the accident, the defendant was receiving about $1.55 per day for his labor. The accident occurred on the 13th day of March, 1888, and the cause was tried on the 22d day of June, 1888. All three of the surgeons examined, one of whom was in attendance on the injured man, testified that the injury was not permanent. Without commenting at length on the facts, we are of the opinion that the case was not properly presented to the jury by the instructions, and that there was material error committed by the trial court in refusing certain instruc-

tions asked for by the plaintiff in error.   No instruction was given respecting the burden of proof, and one that fairly stated that the burden was on the plaintiff, to prove the negligence alleged, was refused.   One contention of the plaintiff in error at the trial was, that the employés, embracing the defendant in error, were several times warned of the danger there might be if they set the bucket so far back that the rope would bind upon the timber, and, as we have said, there was conflicting evidence about it.   The defendant in error requested the court to give an instruction, numbered 6 in the record, that reads as follows:

"The jury are instructed that if the plaintiff disregarded any warnings or cautions given to him either by the foreman in charge, or by a co-laborer, and that the disregard of such warning and caution in any way contributed to the injury complained of, that then in such case the plaintiff cannot recover."

. This was refused, and no notice taken of such fact by any instruction given, except that the court did instruct the jury that—

"An employé is bound to obey the orders of the person placed in authority over him, and if he disobeys, and an injury results to him, he cannot recover for such injury."

There is nothing in the record that any orders had been disobeyed.   There is evidence that a caution or warning had been given repeatedly to the men, in the presence and hearing of the defendant in error, about the danger attending an improper location of the dirt bucket.   This warning could not be tortured into an order, and the failure of the defendant in error to heed it, into a disobedience.   This question was not so presented by the instructions that the jury could comprehend its import.   The instructions did not notice that the defendant in error was charged with contributory negligence, and that there was some evidence tending to prove the same.   No definition of "contributory negligence" was given or rule stated to guide the jury on the only defense made by the plaintiff in error.   A special instruction was requested by

the defendant in error which fairly embodied the law applicable to the state of facts as set forth in the record, and it would have been better, perhaps, to have also given the instruction asked.

There were other instructions given that are subject to grave criticism, and others offered and refused that ought to have been given, but they are unimportant when compared to this instruction. The jury were told by the trial court, in these words:

"If you believe from the evidence that the negligence of the defendant was of a gross and reckless character, and defendant's conduct lacking in all elements of caution and regard for the safety of the plaintiff, you are at liberty to award what are termed exemplary or punitive damages; that is, damages which are given, not on account of any special merit in plaintiff's case justifying the same, but as a warning and lesson to the defendant, to teach it greater respect and care for the rights and safety of others."

Now, we have searched this record in vain to find the utterance of a single witness, or the recitation of any one particular fact, which could by fair construction or just inference be considered as tending to establish wanton negligence, or gross or reckless conduct upon the part of the servants and employés of the railroad company. There is absolutely no testimony to warrant such an instruction. For this alone, if there were no other reasons, this case must be reversed and a new trial ordered. (*K. C. Ft. S. & G. Rld. Co. v. Kier*, 41 Kas. 671; *K. P. Rly Co. v. Cutter*, 19 id. 83; *City of Parsons v. Lindsay*, 26 id. 426; *K. P. Rly. Co. v. Peavey*, 29 id. 169.)

It is recommended that the judgment be reversed, and the cause remanded, with instructions to grant a new trial.

By the Court: It is so ordered.

All the Justices concurring.